[Civ. No. 8496. Second Appellate District, Division One.—February 14, 1935.]

EXCHANGE SECURITIES CORPORATION (a Corporation), Appellant, v. EDWARD RAINEY, Superintendent of Banks, etc., Respondent.

Shreve, Abbey & Shreve, George H. Shreve, Homer N. Boardman and D. P. Hatch for Appellant.

Sullivan, Roche, Johnson & Barry for Respondent.

· THE COURT.—Plaintiff appeals from a judgment in favor of defendant in an action brought to establish a claim against the Pan American Bank of California, an insolvent banking corporation in process of liquidation by the Superintendent of Banks of the State of California. The following opinion, substantially as prepared by Judge Edwin F. Hahn (while acting as a justice *pro tempore* of this court, immediately before his retirement from the bench) is hereby adopted as the opinion of the court in this case:

The evidence, as presented in a voluminous record, presents a complicated situation arising out of the promotion and failure of this ill-fated banking institution. The evidence on several points is vague and unsatisfactory, thus increasing the difficulties encountered in our review of the case. In view of the conclusion at which we have arrived, we will attempt to give a recital only of such evidentiary matters as we deem necessary for an understanding of the grounds for our conclusion.

Early in 1926 a group of men, desirous of forming a state bank to enter the banking field in Los Angeles, organized themselves as the ''Organization Committee of the Pan American Bank of California (organizing)''. On September 9, 1926, this group designated as trustees to collect and hold subscription funds to the stock of the ''Pan American Bank of Californa (organizing)'', F. W. Smith, Will E. Morris, H. B. Hening, and Harry M. Rubey. (For the purpose of brevity these men will hereafter be referred to as the ''trustees'' to distinguish them from the larger organization committee which will be referred to as the ''committee'').

The proposed bank was to have an authorized capital of $2,000,000, divided into 20,000 shares, and a surplus of $1,000,000 to start with. To raise the required $3,000,000 which, under the permit issued by the State Superintendent of Banks, was required to be paid in cash before the bank could open on December 30, 1926, as planned, stock was offered for subscription at $150 per share. Of this sum $100 was to go to capital and $50 to surplus account. Among the subscribers were J. H. Shreve, who on July 8, 1926, subscribed for 50 shares, and F. D. Arrington and E. H. McMath, who on November 30, 1926, subscribed for 100 shares each. It is conceded that the Arrington and

McMath subscriptions were made for J. H. Shreve, and that he was the real owner of their stock subscription rights. Plaintiff is the successor in interest of all the Shreve, McMath and Arrington rights. No cash was paid on these subscriptions, but ninety-day notes were executed by each of the subscribers to the "Trustees" for the full amount of the subscription. That is, Shreve gave a note for $5,000; McMath one note for $5,000 and one for $10,000, and Arrington two notes for like amounts. During the trial, a settlement as to J. H. Shreve subscription and stock was agreed to by stipulation, leaving alone for consideration the transactions relating to the McMath and Arrington subscriptions.

In due course, prior to December 30th, the full amount of the authorized 20,000 shares of stock was subscribed for. Indeed, it was later discovered that subscriptions for over $49,000 of stock in excess of the authorized capital were taken. Of the authorized stock, subscribers paid in cash $1,766,713. For the balance of the subscribed stock ninety-day notes of the subscribers were taken payable to the trustees, with the understanding that these notes would be discounted or hypothecated by the committee so as to raise the full $3,000,000, in cash which had to be paid in to the bank before it was authorized to open.

At the time subscriptions were made by those who gave their notes, they also executed irrevocable powers of attorney to the "Trustees" to transfer any stock to which the subscriber was entitled, general pledge agreements, giving to the "trustees" unlimited powers to pledge, sell and use in any manner the "trustees" saw fit the note of the subscriber, and also any stock that might be issued on account of his subscription.

After discounting some of the subscribers' notes, the committee, in order to secure the full $3,000,000 in cash by December 30, 1926, found it necessary to raise $1,030,000. To secure this money, the committee negotiated loans for this amount from several banks and private concerns. But two of these loans concern us: One of $80,000 from the Capital National Bank of Sacramento and one of $500,000 from the Chatham-Phoenix Bank of New York. These loans were made to the "committee", who as individuals signed and guaranteed the notes. For the $80,000 loan there was

pledged a certificate for 533 shares of Pan American Bank stock, made out in the names of the "trustees", and notes of stock subscribers in the total amount of $80,000. For the $500,000 note there was pledged subscribers' notes totaling the full amount of $500,000, and also a certificate of stock of the Pan American Bank made out in the name of J. H. Smith, one of the trustees, for 3,332 shares, being the total number of shares subscribed for as represented by the pledged notes.

On December 3, 1926, interim subscription certificates were issued by the trustees, for one hundred shares each to McMath and Arrington, and later, the date not appearing, these certificates were canceled and the stock issued as part of the block represented by the certificate for 533 shares which was pledged with the Capital National Bank. It clearly appears that the McMath notes went to the Capital National Bank with others, as part of the collateral to the $80,000 note. As to what was done with the Arrington notes, the evidence is in conflict. There is testimony that these notes were included in the collateral put up with the Capital National Bank. There is also evidence that they were retained by the committee until paid.

On June 15, 1927, the Capital National Bank forwarded to the Pan American Bank for collection the committee's $80,000 note, on which at that time there was a balance remaining unpaid of $59,990. With the note was also forwarded the collateral then held with the note, which included the certificate for 533 shares of bank stock. Pursuant to notices sent out by the Pan American Bank to McMath and Arrington requesting payment of their notes, on June 28, 1927, J. H. Shreve paid in full these notes, which were thereupon canceled and delivered to him. The money paid was by the bank deposited to the account of the "trustees" who were still engaged in collecting subscribers' notes, which funds were in turn paid by the trustees on account of the committee's notes then outstanding. It was the plan and practice of the trustees as subscribers paid their notes, and such subscribers' stock was released from the collateral pledged with the committee notes, to cause to be reissued certificates for the number of shares of stock the subscriber was entitled to, and delivered to him. However, when Shreve paid the McMath and Arrington notes, no certificates

were reissued by the trustees to him, and no stock certificates were issued to him. Instead, at the request of Will E. Morris, who was one of the trustees, Shreve agreed to loan his stock to Morris, giving to him a letter which reads as follows: "Mr. F. W. Smith, president Pan American Bank of California, Los Angeles, California. Dear Sir: I have loaned 250 shares of the capital stock of the Pan American Bank of California to Mr. Will E. Morris, to use to assist in stabilizing the market for the stock. I am instructing the secretary of the bank to transfer this stock for you, as trustee for me, and you may pledge such stock as collateral security in such manner and on such stock obligations as Mr. Morris may direct. Respectfully, J. H. Shreve."

Thereafter upon the full payment by the trustees of the $80,000 note to the Capital National Bank, the 533 shares of stock held as collateral were released to the trustees, who in turn caused it to be reissued in the proper amounts to subscribers whose notes to the trustees had been paid. None of this stock was issued to Shreve, as the "trustees" undoubtedly construed the written authorization given by him to Morris as relieving them of the necessity of making delivery of stock to him out of the 533 share block released by the Capital National Bank. At this time there was still remaining unpaid on the committee's note to the Chatham-Phoenix Bank $400,000, with which 3,332 shares of stock were still held as collateral. The committee had an agreement for the release of a proportionate amount of this stock with each payment of $50,000 on the note. Apparently the trustees intended to issue the McMath and Arrington shares out of the 3,332 shares when released by the Chatham-Phoenix Bank. (A. B. Suppl., fol. 732.) Due to the drop in the market price of the Pan American Bank stock, the Chatham-Phoenix Bank refused to release any of the collateral stock, although $100,000 had been paid on the note. Subsequently, the date not appearing, the Chatham-Phoenix Bank foreclosed on the pledged stock to satisfy the balance remaining unpaid on the note, and the "trustees" found themselves short on stock necessary to deliver to subscribers for 666⅔ shares who had paid their subscription notes. Among the number who had so paid was J. H. Shreve, plaintiff's assignor.

■ In support of its appeal, appellant urges its right to a claim against the Pan American Bank for the money paid by Shreve because: (1) The money was actually paid to the bank by Shreve, whereupon the bank was liable for the delivery to him of the 200 shares of stock for which he made payment. (2) The bank became liable on the completion of its organization for the obligations of the committee in the matter of the stock subscriptions, and was therefore bound to make delivery of the subscribed stock when payment was made therefor. (3) That the ratification of the acts of the committee by the directors of the bank at their meeting on December 27, 1926, made the bank liable for the obligation of the "trustees" to deliver the 200 shares of stock to Shreve when the notes given therefor were paid.

In reply respondents contend that the "committee" and the "trustees", in financing the payment for the stock subscribed for by McMath and Arrington were agents of the subscribers, and that in none of their acts in negotiating the loans or handling the stock after its original issue, and payment to the bank therefor, were the trustees or the committee acting as the agents of the bank.

Respondent's contention is well foundationed both in the evidence and the law. The activities of the "committee", and that includes the "trustees" who were a part of the committee, in negotiating the loans to pay in cash for the stock of subscribers who gave notes for their subscriptions, were clearly on behalf of and for the benefit of the stock subscribers who were unable to meet the cash payment requirements of the law. This method of financing the note subscriptions was understood by these subscribers, for when they gave their notes, they also executed irrevocable powers of attorney and general pledge agreements to the "trustees", which clearly and specifically made the "trustees" their agents for the purpose of raising money to pay for their stock. It may be conceded as argued by appellant that there is no law that precluded the committee from taking subscribers' notes for stock subscriptions so long as the notes could be discounted or converted into the cash necessary to meet the requirements of the permit. But such right does not affect the situation with which we have to deal, for the reason the McMath and Arrington notes never were discounted or converted into cash by the "committee".

The evidence justifies the inference that Shreve knew from the outset that the McMath and Arrington notes and stock were to be used as collateral just as they were and he clothed the "trustees" through McMath and Arrington with authority as his agent to do the things which they did with their notes and stocks.

Nor does the law that the bank when organized becomes the beneficiary of the activities of the committee and all of its benefits, rights and property acquired in the course of the promotion of the corporation, change the situation here involved; for under no theory can it be successfully maintained that the Pan American Bank became liable for the committee's notes to the Capital National Bank and the Chatham-Phoenix Bank. When the money was paid into the bank for stock and the stock was issued and delivered, by or on behalf of the bank the obligations of the bank to the subscriber were fulfilled so far as stock was concerned. From that time the stock was used under authority given by the subscriber for his use and benefit until he became entitled to have it returned to him from his agent to whom he had entrusted it.

■ Appellant has cited and quoted from a number of cases in support of his theory that the bank was liable to deliver the stock to the subscriber when he paid for it. As an abstract proposition of law, a subscriber is entitled to delivery of the stock for which he makes payment. Here the evidence shows the certificates were issued and delivered to the agents of McMath and Arrington, who were duly authorized to receive them. Nor does appellant's theory that the bank became liable to Shreve to return the $30,000 paid to it on the McMath and Arrington notes when it failed to deliver to him the stock for which the notes were originally given, find support in either the facts or the law. The bank in receiving this money was acting as the agent of the Capital National Bank for the purpose of collecting the collateral notes as they became due; and the money so received was credited to the "trustees" and forwarded to the Capital National Bank in part payment of the $80,000 note. Whether or not Shreve at the time he paid the money had a right to demand from the bank the 200 shares of stock for which the notes were given is not necessary for us to decide, because it appears, first, that he made no such

demand; and secondly, he executed and delivered a docu-
ment to two members of the "trustees" which authorized
them to use his stock as collateral to any loan they saw fit.
Clearly the stock was not to be used as collateral to any
borrowing by the bank. It is fair to assume that Shreve
was familiar with the situation with respect to the commit-
tee's borrowings, and with the fact that other members of
the committee had permitted their stock for which they had
paid in cash, to be put up as collateral with the committee's
$500,000 note. It is a fair inference that it was his purpose
to cooperate with the "trustees" as other members had in
an effort to avoid action by the Chatham-Phoenix Bank on
the $500,000, which was then threatening. The Pan Ameri-
can as a corporate entity had no obligation to the Chatham-
Phoenix Bank, nor would it have had any right to guar-
antee, or support by pledging any of its securities, the
obligation of the committee to that bank.

We have not extended this opinion with the citation of
authorities, or any discussion of the cases cited in the briefs
filed. In view of our conclusion that the "trustees" in pos-
sessing and handling the McMath and Arrington notes and
stock, were the agents of Shreve in handling and dealing
with this stock, it requires no citation of authorities, or dis-
cussion of legal principles to support the conclusion that
the Pan American Bank was not liable for the failure of the
trustees to return the certificates entrusted to them, or for
repayment of the money paid in taking up their notes. In-
asmuch as the facts as recited fully support the findings, the
conclusions of law which necessarily follow cannot well be
questioned.

In view of the conclusion arrived at, it becomes unneces-
sary to discuss other points dwelt on in the briefs.

The judgment is affirmed.

A petition for a rehearing of this cause was denied by
the District Court of Appeal on March 14, 1935, and the
following opinion then rendered thereon:

THE COURT.—On petition for rehearing. In this peti-
tion it is suggested that this court, in the opinion filed, made
some statements of fact which are "in direct conflict with
the record". Also petitioner suggests extensive additions

which he thinks the court should make, in order to have a more complete statement of the evidence. The record of the trial contains about 600 pages. The transactions were numerous, and the court was called upon to unravel a complicated history. As the opinion says, we attempted to give "a recital only of such evidentiary matters as we deem necessary for an understanding of the grounds for our conclusion".

In attempting thus to draw, from the record, the facts required for a statement of the case, it may be that our judgment was wrong concerning the effect of the evidence in some particulars. For example, we said: "For the $500,000.00 note were pledged subscribers' notes totaling the full amount of $500,000.00, and also," etc. On page 270 of the transcript there is testimony that there were not any notes put up as collateral with the principal note for that loan. There is evidence of "certificates" belonging to subscribers, which were used as such collateral, in addition to a 3,332 share certificate pledged. (Transcript, pp. 250, 251 and 137.) Apparently the clause above quoted, containing the statement that "subscribers' notes" were pledged for that loan, is not correct.

We are of the opinion, however, that the facts essential to a proper understanding of the case are substantially those set forth in the opinion, and that even if there be some further defects in the statement, they are not such as would justify a rewriting of the opinion or a change in the decision.

The petition for rehearing is denied.

A petition by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on April 15, 1935.